No. 22634.

JOSEPH L. TOMSAK AND KENT LEROY STRICKER *v.* THE
PEOPLE OF THE STATE OF COLORADO.
(442 P.2d 825)

Decided July 1, 1968.

DONALD P. MACDONALD, JIM R. CARRIGAN, for plaintiffs in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JOHN P. MOORE, Assistant, for defendant in error.

*In Department.*

Opinion by MR. CHIEF JUSTICE MOORE.

PLAINTIFFS in error will be referred to as the defendants. They were convicts serving a term in the state penitentiary and while playing in a band walked away and were endeavoring to escape when they committed the acts for which they were charged. They were accused, and found guilty, of the crimes of burglary, larceny of a motor vehicle, and kidnapping, and, by proper judgment in accordance with the verdicts of the jury, were sentenced to further confinement in the penitentiary.

At the close of the People's case a recess was taken by the court and by consent of all the parties the jury was permitted to separate and go to their respective homes for the night. They were properly instructed not to discuss the case during the recess; not to read any newspaper articles; or watch any television programs pertaining to the case. These events all occurred on Thursday, January 11, 1966. On that evening an article concerning the case appeared in a paper published in

Canon City, Colorado. The article gave details of the evidence introduced at the trial; stated that the defendants were convicts who had attempted to escape from the prison; were on trial for the escape; and were apprehended following their disappearance from the prison band. The defendants rely on the following portion of the newspaper article relating to their arrest:

"They were captured five days later about six miles north of Guffy by CSP officers. Several days after their escape, the pair entered the home of W. O. Hardesty, on Canal St., where they allegedly killed a small pet dog, then tied up Hardesty's 17-year old daughter."

On the morning following the appearance of the newspaper article defendants filed a written motion for a mistrial, which was overruled by the trial judge the court commenting as follows:

"THE COURT: I think there is no question, Mr. Hawthorne, but that the information contained in the newspaper article is inaccurate. As I recall the testimony yesterday, the testimony was as you stated it. There was no evidence that these men had killed this dog. There was no evidence in regard to the location of the Trott Ranch at the place located in the newspaper article.

"The thing that concerns me is that these men are not on trial for escape in this hearing. However, there is no showing here that the jury is prejudiced by virtue of this article in the newspaper. Of course, there are no affidavits filed; there's no showing that any member of the jury read the article. And in the absence of showing that someone had read and been influenced by this article, the Court will assume that the jury abided by the admonition which was given to the jury each time they were allowed to separate.

"For those reasons, Mr. Hawthorne, the motion will be overruled. I think you now have it in the record and it can be passed on by a higher court."

*Quintana v. People*, 158 Colo. 189, 405 P.2d 740, and *Mares v. United States*, 383 F. 2d 811, are relied on by

defendants as supporting their position that a mistrial should have been granted. Each of those cases is distinguishable on the facts from the case at bar. In the instant case it is not shown that any of the jurors had read the article. Admittedly, three statements were contained in the article which were not factually accurate:

First. The defendants were not on trial for escape. However, there was an abundance of evidence, all of which was competent and admitted without objection, proving that defendants were escapees from the prison.

Second. There was testimony of the death of a pet dog belonging to the Hardesty family; that the home had been entered by the defendants; and that members of the family had been terrorized. There was no direct evidence that the defendants had killed the dog. However, the jurors under the circumstances could have drawn the inference that it had been killed by defendants.

Third. There was no evidence as to the location of the Trott Ranch where defendants were apprehended by officers of the prison. It could not possibly make any difference where the Trott Ranch was located and therefore could not have been prejudicial.

Assuming that all the jurors had read the newspaper story in violation of the court's instruction, it is wholly unreasonable to conclude that anything contained therein could have influenced any juror to the prejudice of the defendants. No showing was made that anything in the article came to the attention of any of the jurors.

 The law of this state on the subject is expressed in *Hammons v. People,* 153 Colo. 193, 385 P.2d 592, wherein we stated, *inter alia*:

"* * * Here the jury had been instructed not to read about or discuss the case and absent a showing to the contrary, it is presumed that the jurors followed the court's instructions. * * *"

The duty to make the showing of prejudice rested upon

the defendants. They made no showing that any one of the jurors had read the news account.

■ There was ample proof to establish each of the crimes of which defendants were found guilty. Jennefer Hardesty was one of the victims of the acts of defendants. She related the story of what happened; told of various conversations with the defendants in which they stated that they were escapees from prison; and also how they waited for her father to come home so that they might take his car for use in their escape. All of this evidence was admitted without objection.

Mr. Hardesty was on the witness stand and told of how he was tied and how the defendants took his clothing and other articles. He was cross-examined by defense counsel and was asked:

"Q. Can you recall the conversation as you entered your house? What was said by these gentlemen to you, if anything?

"A. Mr. Tomsak ordered me to lay down on the floor, said that if I would comply with the request there would be no harm to anyone.

"I asked them, I think, how desperate they were and what their intentions were, and they informed me that all they wanted was to get away.

\* \* \*

"Q. Did you understand how long they might have been out?

"A. No, I didn't. I wasn't — I didn't know.

"Q. How long they had been in the mountains? Did you know where they had been?

"A. I knew that they had stayed next door for one night, my daughter informed me, but that's all I did know."

■ It is urged as ground for reversal that the crime of kidnapping was not established by the evidence. Not so. C.R.S. 1963, 40-2-44 (2) provides:

"A person shall be guilty of kidnapping who willfully: \* \* \*

"(2) Without lawful authority seizes, confines, imprisons, keeps or detains another against his will, forcibly or otherwise, within the state or to be sent out of the state;"

The evidence is overwhelming and undisputed that both Jennefer Hardesty and Mr. Hardesty her father were, at the point of a gun, detained, seized, confined and imprisoned within their own home, and that the defendants used force and made threats of personal harm if their demands were not complied with.

Mr. Lee Trott of Guffy, Colorado, testified of defendants coming to his place, and that they told him who they were.

"Q. What did they tell you, Mr. Trott?

"A. They told me that they had walked away from the penitentiary and needed to hide out, and they wanted to — I said, what do you want us for? And they said, we want to come in and spend the day; we want something to eat, and we want to clean up. And we want you to drive one of your cars out of the garage and we'll put ours in. And we'll spend the rest of the day and tonight we'll take one of your cars and leave, and nobody will be hurt if you go along with us."

Mr. Trott then related the event of his sick wife getting out of bed to get them something to eat.

"A. I told them that my wife was sick in bed with the Flu, and we would go in and tell her about it. So, we went in, they followed me in, and we went right into the bedroom and told her what the deal was, and that they wanted something to eat. And, they were real considerate. They said, you're sick, and you stay right there where it's warm. And we're good cooks and we'll get something to eat ourselves.

"And she said, no, I'll get up and get something to eat. So, she did.

"And we ate dinner and talked awhile. And then this prison pickup came by and went on by. And in about five or ten minutes it came back and hesitated at the

gate just a few seconds and buzzed in. And the officers jumped out of the car with shotguns and run up to the windows and told them to come on out. Called their names and told them to come out."

There was further evidence of how the defendants finally surrendered to the prison officers. No objections were made to any of the evidence hereinabove mentioned. The motion for a new trial contains no assignment that error was committed in permitting evidence to be introduced that proved the defendants were escapees.

■ Defendants raise certain questions regarding the instructions. These points are before the court for the first time and were not raised in the trial court. There were no objections to the instructions which were given. The motion for a new trial is silent with regard thereto. The two instructions tendered by defendants were fully covered in other instructions. Matters presented for the first time on writ of error will not be considered by this court. *Rhodus v. People,* 158 Colo. 264, 406 P.2d 679; *Zeiler v. People,* 157 Colo. 332, 403 P.2d 439; *Cruz v. People,* 149 Colo. 187, 368 P.2d 774; Colo. R. Crim. P. 30.

The judgment is affirmed.

MR. JUSTICE MCWILLIAMS and MR. JUSTICE PRINGLE concur.